**BERKOWITZ, LICHTSTEIN, KURITSKY,**
**GIASULLO & GROSS, LLC**
Roy J. Thibodaux, III, Esq.
rthibodaux@blkgg.com
Stuart M. Kuritsky, Esq.
skuritsky@blkgg.com
75 Livingston Avenue
Roseland, New Jersey 07068
Phone: (973) 325-7800
Fax: (973) 325-7930
Attorneys for Plaintiff Wendy P. Dressler

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WENDY P. DRESSLER,<br><br>                              Plaintiff,<br><br>              v.<br><br>LIME ENERGY,<br><br>                          Defendants. | Civil Action No.<br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Wendy P. Dressler ("Plaintiff" or "Dressler"),[1] by her attorneys, Wolf Haldenstein

Adler Freeman & Herz, LLP, against Lime Energy Co. ("Defendant," "Lime Energy" or "the

Company), respectfully alleges as follows upon information and belief, except as to allegations

concerning Plaintiff, which are made upon personal knowledge, and except as otherwise indicated

herein:

---

[1] Although Plaintiff recently remarried and changed her last name, she used the name Wendy P. Parris
while employed at Lime Energy.

## PRELIMINARY STATEMENT

1.      Plaintiff is a former employee of Defendant Lime Energy.  For the reasons set forth below, Plaintiff brings this action because Defendant illegally retaliated against Plaintiff for making disclosures that are protected under Section 806 of the Sarbanes Oxley Act of 2002 ("Sarbanes Oxley Act") (18 U.S.C. § 1514A), thereby violating the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd Frank Act") (15 U.S.C. § 78u-6, *et seq*.). Specifically, Defendant terminated Plaintiff for exercising her legally-protected rights to inform her supervisors about, and refusal to participate in conduct that she reasonably believed violated laws and rules designed to prevent companies whose securities are registered under the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq*. (the "Exchange Act"), from filing and otherwise using fraudulent financial statements.

2.      In response to Plaintiff's protected activity, Plaintiff encountered hostility, threats to her job security, and was ultimately terminated from her position.  Such actions by Defendant violated 15 U.S.C. § 78u-6(h)(1)(A)(iii) of the Dodd-Frank Act.

## PARTIES

3.      Plaintiff Wendy P. Dressler is a former employee of Lime Energy.  Plaintiff was employed by Defendant from May 2010 until she was terminated on November 5, 2012.  During the course of her employment at Lime Energy, Plaintiff worked at the office located at 3 Convery Boulevard, Suite 600, Woodbridge, NJ 07095.  Ms. Dressler initially held the position of administrator of the public sector for New York projects.  From late 2010 until her termination, Ms. Dressler held the position of accounting manager in the Company's utilities sector.

4.      Defendant Lime Energy is a Delaware corporation with principal executive offices located at 16810 Kenton Drive, Suite 240, Huntersville, NC 28078.  Lime Energy is a public

company whose securities are registered under the Exchange Act. Prior to August 2011, Lime Energy's principal executive offices were located at 1280 Landmeier Road, Elk Grove Village, IL 60007.

## VENUE AND JURISDICTION

5.      This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. 78u-6(h)(1)(B)(i) and 28 U.S.C. §§ 1331 and 1367.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) insofar as the events, actions, and omissions giving rise to these claims occurred in this District.

## BACKGROUND

7.      On or about May, 2010, Plaintiff began employment with Defendant Lime Energy. Plaintiff was initially employed by the Company's public sector division called Landmark Mechanical of New York but ultimately began receiving paychecks from Lime Energy.

8.      At the time, James Smith was the President, John O'Rourke was the Chief Executive Officer ("CEO"), and Adam Procell was a Vice President of the Company.

9.      Upon being hired, Plaintiff's initial title was the administrator of the public sector for New York projects.

10.     As work in the public sector slowed, Eric Dupont, the controller of the Company, and Julianne Chandler, assistant controller of the Company at that time, asked Plaintiff to assist with managing the accounts payable (A/P) of the utilities program which was, at the time, a new and upcoming division of the Company located in the same office building in Woodbridge, New Jersey, as the public sector division.

11.     In addition to providing support for the utilities program during its startup phase, it was a way for Plaintiff to maintain full-time employment at the Company as the public sector did not have sufficient work.

12.     While employed in the Utilities Division, Plaintiff was responsible for maintaining the accounts payable for two utility programs: New Jersey Direct Install and Consolidated Edison, Inc. ("Con Ed").

13.     On or about January 2011, Plaintiff became a full-time employee in the Utilities Division where she reported directly to Jack Almeida, as well as, in a horizontal chain of command, to Karan Raina.

14.     In her new capacity, Plaintiff was responsible for the program's accounts payable, as well as coding invoices and updating project entries in the Company's "Solomon" accounting software system.

15.     Plaintiff's bookkeeping responsibilities also involved updating project entries even in instances where backup documentation (including, *inter alia*, the relevant project contracts and associated invoices and purchase orders) was not available.  Plaintiff's understanding at the time was that the contracts updated in the Solomon system were completed projects for which the Company did not yet have backup documentation but that the documentation existed and would be forthcoming.  The standard explanation was that because the Company was growing so fast, they did not have all of the signed completion paperwork in place.

16.     In addition, Plaintiff was responsible for registering new projects in the Solomon system.  Karan Raina maintained a spreadsheet with a list of new construction jobs, though his source for the list was unknown to Plaintiff.  Upon receiving a list of new projects, Plaintiff would be responsible for setting up a new entry for the project in the Solomon system, which involved

populating various fields in the system with information such as project name, contract amount, and project budget.  At that time, however, Plaintiff did not know whether the Company had made a TRC[2] submission for a particular project nor did Plaintiff have all of the backup documentation for the new project entries.

17.     In an effort to implement checks and balances into her work, Plaintiff requested to be notified when the Company received TRC approvals for new projects in the New Jersey Direct Install program.  Plaintiff also brought her concerns about the lack of documentation to Karan Raina who assured her that the backup information was available and would be uploaded to the system in time.

18.     As time went on, however, Plaintiff found that she was receiving more and more "completed" contracts lacking sufficient backup documentation such as the contract itself, TRC submittal documentation, TRC approvals, purchase orders, and invoices.

**Improper Revenue Recognition**

19.     In or around the third or fourth quarter of 2010, Plaintiff and two other employees, Kimberly Buffardi and Victoria Foster, assembled an Excel spreadsheet in order to track, on an ongoing basis, the Company's actual work performed based on the supporting documentation (the "Tracker") in large part because the figures reflected in the Solomon system appeared inconsistent with the information recorded on the Tracker.  Plaintiff and her colleagues maintained the Tracker on a shared drive where everyone could access the file, including Raina.

20.     Soon after joining the Utilities Division and when working on the Company's 2010 year-end statements, Plaintiff also became aware of a significant discrepancy in Lime Energy's

---

[2] TRC Companies, Inc. ("TRC") served as an intermediary between Lime Energy and the New Jersey Direct Install Program in the State of New Jersey.  Willdan Energy Solutions provided similar services for the Con Ed Program.

accounts receivable with respect to the Company's TRC account when working on the Company's 2010 year-end statements.

21.     The data in the Solomon system reflected that the funds owed by TRC were significantly greater than the work that Lime Energy had actually performed under contract in reality, and thus, greater than what the Company would, in fact, be entitled to collect from TRC.

22.     Based on its Solomon entries, it appeared that Lime Energy was recording revenue on contractual arrangements even though these contracts had not been signed, TRC approvals had not been submitted, and the contracts had not yet received TRC approval.  Lime Energy could not commence work on a particular project without TRC approval of each contract involved in the New Jersey Direct Install Program.  Therefore, Plaintiff began to suspect that the Company was recognizing revenue from completed contracts and booking it as an account receivable from TRC even though no work could have been done on those contracts because TRC approval had yet been obtained for that contract.

23.     In early 2011, Plaintiff brought these accounting discrepancies to the attention of both Almeida and Raina.  Almeida and Raina informed her that they were aware of these problems with the TRC accounts receivable, they were working to resolve it, and that Eric Dupont, Julianne Chandler, Adam Procell, and John O'Rourke were all aware of this situation.  Almeida and Raina further assured Plaintiff that the discrepancy was due to the fact that the utilities sector was a new business experiencing rapid growth.  Although a number of people above Plaintiff were aware that the Company was improperly recognizing revenue and Plaintiff wanted to make the correcting journal entries, Almeida and Raina ordered Plaintiff not to make the correcting journal entries on the Company's accounting program.

24.     On several occasions, Plaintiff told Almeida and Raina that Lime Energy might have to restate its financial statements to correct the revenue improperly recorded in prior quarters. In response, Almeida became angry with Plaintiff and refused to speak to her.  Raina tried to downplay Almeida's anger and assured Plaintiff that it would all work out in the end.

25.     In addition to speaking with Almeida and Raina, in early 2011, Plaintiff communicated to other project managers her concerns that the Company had recorded and recognized revenue in the New Jersey Direct Install program on contracts that had no TRC approval.  Plaintiff spoke to both Jonathan Murano, who was assuming a new position in the Utilities Division, and Arjun Sayori, a program manager for the Con Edison program who subsequently became an Information Technology ("IT") manager.  Murano encouraged her to continue trying to prove her findings and to report her concerns to the next level of command.  She also informed the following Company employees of her concerns regarding the reporting discrepancies, all of whom had greater seniority within the Company than Plaintiff: Tony McCoy, New Jersey Direct Install program manager; Stephen Swartz, Con Edison program manager; Michael Geyer, National Grid program manager; Barry Allen, Long Island Power Authority program manager; and Angelo Baldassire, Long Island Power Authority program manager.  Based upon information and belief, all of the above employees were generally aware of the Company's accounting problems but Plaintiff informed them of the full extent of the accounting discrepancies. Plaintiff's information and belief was based upon conversations with these persons.

26.     At the same time, Plaintiff continued to communicate her concerns to all of the employees described above about the Company's lack of internal controls and checks and balances.

27.     In January 2011, Plaintiff proposed to implement a new internal control system of tracking from start to finish for each component of a project in an effort to bring order and transparency into the bookkeeping process for the New Jersey Direct Installs program.  Plaintiff hoped that, if successful, the Company would implement this system for all of the other utility programs.   Plaintiff's proposal involved a step-by-step process describing by job title and description how a particular contract should be processed in the system, booked, and revenue recognized and invoiced.

28.     Throughout her employment, Plaintiff was asked and expected to prepare journal entries that created accruals for costs on contracts that were incomplete.  Plaintiff was informed that although there was no supporting documentation from the vendor yet, the work was completed and the Company knew it would have to pay the costs at some point.  Plaintiff subsequently discovered that, in many instances, there was no TRC approval for the relevant project and, therefore, work had not even begun.

29.     As one example of the Company's improper accounting practices that Plaintiff hoped the new system would eliminate, on or about February 2, 2011, Plaintiff discovered that the Company had paid an invoice to a contractor called 3900 Group on a significant project even though the contractor had performed no work under the relevant contract.  When Plaintiff had initially noticed that there was no invoice to support the contract entry, she had brought the matter to Raina's attention.  Within a relatively short time of raising her complaint to Raina, Plaintiff was furnished with an invoice from 3900 Group.  The invoice did not state what work had been performed but she was instructed by Raina to post this as a payable.  3900 Group processed the invoice and the Company paid the relevant amount.  However, in the process of billing TRC for the project, Plaintiff discovered that, at some point, there was a dispute between Almeida and 3900

8

Group so that no work was performed by the 3900 Group under this contract.  Thus, not only did the Company pay an invoice to an outside contractor for work that was not performed, the Company then hired and had to pay another company to complete the contract.  To Plaintiff's knowledge and belief, this payment to the 3900 Group was not recouped.

30.     Almeida initially seemed receptive to this proposed internal control system, but by the end of February 2011, Almeida became angry when, as a direct result of implementing Plaintiff's system, the Company failed to meet its revenue goals.  At that point, he reversed course and decided to abandon the new system.  He informed Plaintiff at a meeting with other project managers that her process did not work, that she reported to him, and that the Company would go back to its prior system of making entries in the Solomon system without backup documentation.

31.     In addition, Almeida repeatedly admonished Plaintiff when the balance in the "underbilled"[3] account became too high.  Plaintiff was tasked with preparing invoices in the Solomon system, which would have the effect of transferring an associated balance from "underbilled" into accounts receivable.  As a result, the Company routinely mailed invoices to customers without proper sign-off from the construction team that the project had been, in fact, completed.  Moreover, billing customers merely shifted the "underbilled" imbalance to accounts receivable where it subsequently became a problem again as the balance in accounts receivable grew.  Almeida would then become upset with Plaintiff and demand that she collect the money owed by customers in order to reduce the balance in the accounts receivable.  Plaintiff argued, however, that she could not collect funds on these outstanding bills without the supporting documentation that the project had been completed.

---

[3] The underbilled account purported to reflect the Company's completed jobs that had not yet been billed to Lime Energy's clients.

32.     On several occasions, Almeida articulated to Plaintiff that everyone in the Company understood what was going on and that if she didn't keep quiet, he wouldn't be able to save her and she would lose her job.

33.     In or around the first quarter of 2012, at a large Company meeting with Jeff Mistarz, the Company's Chief Financial Officer ("CFO"), who was visiting the Woodbridge office, Plaintiff began to voice her concerns to Chandler, now the new controller of Lime Energy, and Raina, promoted to Director of the Utilities Division, that there were significant discrepancies in the Company's accounting records.   When Plaintiff brought up the issue of accounting discrepancies during the meeting, Raina sent her an email warning her that she was saying too much.  At a meeting break, Raina and Chandler ushered her into a different office and told Plaintiff not to explain her answers to any questions or volunteer any information.  At the time, Chandler informed Plaintiff that she understood what was going on but that they could not talk about it.

34.     Several months later, Plaintiff was in the Company's Long Island office to train a new employee when she ran into Chandler who was conducting internal audits at that office. Plaintiff asked Chandler to visit Woodbridge and perform a similar audit of the accounts there. Chandler again informed Plaintiff that she knew what was happening but that she could not discuss it.  However, Chandler agreed to visit the Woodbridge office and assured Plaintiff that she would audit the utilities program accounts.

35.     In or about early July 2012, Plaintiff found herself at a meeting with Almeida, where, accompanied by Sayori and Murano, she presented the Tracker to Almeida to demonstrate the discrepancies between the Company's contracts and accounts supported by proper documentation, as reflected in the Tracker, and the contracts and accounts reflected in the Company's accounting software in Solomon, a significant portion of which did not have

supporting documentation.  Plaintiff pointed out where the Company would need to correct its financials for the second quarter of 2012.  Plaintiff also informed Almeida that she had requested Chandler to visit the Woodbridge office and audit the utility programs.

36.     In response, Almeida flew into a rage and informed Plaintiff that she could no longer report to him.  He threw his notebook across the room and stormed out of the meeting.

37.     Prior to leaving for a previously-scheduled vacation that weekend, Plaintiff called James Smith, the President of Lime Energy at the time.  Plaintiff informed Smith that she could no longer continue following the Company's accounting practices.  Smith assured her that she was doing the right thing by reporting to him and apologized that she had received no support from the lower levels of command, namely, Almeida and Chandler.

38.     Within twenty-four hours, Smith called Plaintiff again and informed her that he was flying to the Woodbridge office to meet with Almeida, Raina, and Plaintiff in person and review Plaintiff's spreadsheets in the Tracker.  Smith also informed Plaintiff that he had already discussed the matter with CEO O'Rourke.  Smith assured Plaintiff that she did the right thing by reporting the accounting problems to him.

39.     Plaintiff returned from her vacation on or about July 4, 2012.

40.     As promised, Smith flew to Woodbridge to review the accounting discrepancies. On or about July 5, 2012, Smith met with Plaintiff, Raina, and Murano in person.  Jack Almeida participated via telephone.   At the meeting, Plaintiff explained the discrepancies and inconsistencies in the Company's accounting system.

41.     Plaintiff learned from Smith that CEO O'Rourke would bring the matter to the attention of the Board and that the Company was planning to conduct an internal investigation.

Smith encouraged Plaintiff to continue reporting the truth and continue tracking projects as she had been doing.

**The Company's Internal Investigation**

42.    In conjunction with the internal investigation, Mistarz and Chandler introduced a new software system called Quickbase to supplement the existing system.  Plaintiff and the other members of her team were directed to begin uploading the supporting documentation for the various contracts into the Quickbase system.

43.    In the meantime, Plaintiff cooperated fully and assisted with the Company's internal investigation by, *inter alia*, explaining her findings to the Company's outside forensic accountant and producing documents, as well as providing access to her mobile phones and her computer.

44.    On July 17, 2012, the Company filed a press release with the United States Securities and Exchange Commission ("SEC"), announcing the results of a partial internal review stating that "the Audit Committee of the Board of Directors of Lime Energy Co. (the "Company") determined that the Company's consolidated financial statements on Form 10-K for the periods ended December 31, 2010 and December 31, 2011 and quarterly report on Form 10-Q for the period ended March 31, 2012 (the "affected financial statements") may no longer be relied upon." According to the July 17, 2012 press release, the Company's management and Audit Committee believed that the Company had improperly recorded revenue:  "In some cases, it appears that non-existent revenue may have been recorded.  In other cases, it appears that revenue may have been recorded earlier than it should have been."  The Company advised that the misreporting might require restatement of all of the affected financial statements.

45.    On or about August 1, 2012, Plaintiff learned that Jack Almeida and Karan Raina were terminated.  Employees were informed that the termination was part of a Company downsizing and that Almeida and Raina received severance benefits.

46.    Throughout the summer and into fall, Plaintiff continued to work on the Quickbase system, uploading evidentiary support for the New Jersey Direct Install Program's contracts.

**Plaintiff's Termination**

47.    On Monday, November 5, 2012, when Plaintiff arrived to work one week after Hurricane Sandy, she received a call from CFO Mistarz and Sandra Holtz, a Human Resources employee, asking whether she would be available for a phone call at 2 P.M. that day.  On the 2 P.M. call, Mistarz and Holt informed Plaintiff that the Company was letting her go because the Company's corporate counsel believed that Plaintiff should have called the 1-800 number in the employee handbook or reported the Company's accounting issues to the SEC.  Victoria Foster, who had assisted Plaintiff with the formation of the Tracker, was terminated on the same day as Plaintiff.  At 3:00 P.M. in a company-wide Skype conference call, employees were informed by Messrs. O'Rourke and Procell that employees James Smith, Julianne Chandler, Victoria Foster, and Wendy Dressler were terminated after an internal investigation.

48.    Plaintiff was not aware that she was personally a target of an internal investigation. In fact, in the months leading up to her termination, Plaintiff had devoted countless hours to assisting upper-level Company management with the internal investigation into the Company's accounting practices.

49.    Prior to her termination, Plaintiff was, at all times, a diligent and dedicated employee who was recognized for her superior performance with an "Employee of the Quarter" Award in November 2010.

## COUNT I

### Retaliation in Violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act

50.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

51.     Defendant has violated 15 U.S.C. § 78u-6(h)(1)(A) because its decision to retaliate against Plaintiff and terminate her employment was motivated, in part, by Plaintiff's disclosures, which are protected by Section 806 of the Sarbanes Oxley Act (18 U.S.C. § 1514A).

52.     Section 78u-6(h)(1)(A)(iii) of the Dodd Frank Act lists four categories of protected and/or required disclosures, including "disclosures that are required or protected under the Sarbanes Oxley Act of 2002 (15 U.S.C. § 7201, *et seq*.), this chapter, including section 78j-1(m) of this title, section 1513(e) of title 18, and any other law, rule, or regulation subject to the jurisdiction of the Commission."

53.     The Sarbanes Oxley Act of 2002 was designed "[t]o protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws, and for other purposes." Sarbanes Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (2002).

54.     In providing information of misconduct to the Company's managers, officers, and forensic accountant, Plaintiff engaged in protected conduct under Section 806 of the Sarbanes Oxley Act (18 U.S.C. § 1514A) because Plaintiff informed her managers, supervisors, and agents about conduct that she reasonably believed violated "provision[s] of Federal law relating to fraud against shareholders," including but not limited to, SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), which prohibits Lime Energy from making false statements or engaging in deceptive practices in connection with the sale of securities.

14

55.     Defendant's conduct set forth in this Complaint violates 15 U.S.C. § 78u-6(h)(1)(A) because Defendant's decision to retaliate against Plaintiff and terminate her employment was motivated, in part, by Plaintiff's disclosures, objections, and complaints about Defendant's improper revenue recognition and other accounting misconduct.

56.     These disclosures by Plaintiff were required and/or protected by the Sarbanes Oxley Act, 18 U.S.C. § 1514A, and thus, the Dodd Frank Act, 15 U.S.C. § 78u-6.

57.     Defendant's violation of 15 U.S.C. § 78u-6(h)(1)(A) has caused Plaintiff damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff hereby demands judgment against Defendant as follows:

i.      On her first cause of action, assessing compensatory damages including (a) reinstating Plaintiff to her position at Lime Energy with the same seniority status that she would have had but for the retaliation; (b) awarding Plaintiff double the amount of lost back pay, plus interest; and (c) compensating Plaintiff for litigation costs, including expert witness fees, and reasonable attorneys' fees; and

ii.     Granting such other and further relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands trial by jury on all counts for which trial by jury is available.

BERKOWITZ, LICHTSTEIN, KURITSKY,
GIASULLO & GROSS, LLC
Attorneys for Plaintiff Wendy Dressler

Dated:  November 10, 2014            By: /s/ Roy J. Thibodaux III, Esq.
                                    Roy J. Thibodaux III, Esq.
                                    Stuart M. Kuritsky, Esq.
                                    BERKOWITZ, LICHTSTEIN, KURITSKY,
                                    GIASULLO & GROSS, LLC

75 Livingston Avenue
Roseland, New Jersey 07068
Telephone:     (973) 325-7800
Facsimile:     (973) 325-7930
Email:         rthibodaux@blkgg.com

## LOCAL CIVIL RULE 11.2 CERTIFICATION

In accordance with 28 U.S.C. § 1746, the undersigned counsel hereby certifies that, to my knowledge, the matter in controversy is not the subject of any other action or proceeding pending in any court or in any pending arbitration or administrative proceeding.

Dated:  November 10, 2014                      /s/ Roy J. Thibodaux III, Esq.
                                              Roy J. Thibodaux III, Esq.

Of Counsel:

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Charles J. Hecht
hecht@whafh.com
Maja Lukic
Lukic@whafh.com
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 545-4677